J-A25028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: O.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M. AND J.M. | No. 1196 EDA 2015 |

Appeal from the Order Entered March 16, 2015
In the Court of Common Pleas of Northampton County
Orphans' Court at No(s): No. OC-2014-0040

BEFORE:  DONOHUE, J., MUNDY, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED NOVEMBER 06, 2015**

Appellants, J.M. (Mother) and J.M. (Stepfather), appeal from the March 16, 2015 order denying their petition for the involuntary termination of parental rights of C.H. (Father) with respect to the female child, O.H.[1]  Upon careful review, we vacate and remand with instructions.

The record reveals the following factual and procedural history.  O.H. was born in August 2009, during the marriage of Mother and Father.  Mother

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Mother and Father are the biological parents of O.H.

and Father separated in February of 2011.[2] N.T., 12/17/14, at 9. Following the separation, Father lived with his mother (Paternal Grandmother) in her home. *Id.* at 48, 50. By an interim custody order dated May 12, 2011, the orphans' court granted Mother sole legal and primary physical custody of O.H. *Id.* at Exhibit 8. The orphans' court granted Father partial custody every Sunday from 12:00 p.m. to 6:00 p.m., supervised by Paternal Grandmother, "until he produces a clean urine test result …."[3] *Id.* at ¶ 3. The orphans' court directed that Father shall undergo random drug testing for a period of six months, and, if Father "has an unexcused positive, a no show, or a dilute, his visitation shall automatically become supervised again, pending further Order of Court." *Id.* at ¶ 4. Father exercised unsupervised visits at Paternal Grandmother's home for an unspecified period of time. *Id.* at 31, 50.

After the marital separation of Mother and Father, Paternal Grandmother provided childcare for O.H. while Mother was working and/or attending school. N.T., 12/17/14, at 28, 30. In May 2013, Mother stopped taking O.H. to Paternal Grandmother's home. *Id.* at 24, 32. In June 2013, Father, through counsel, filed a petition for contempt against Mother and a

---

[2] Mother and Father reconciled at the end of 2011, but they separated again for the final time in January of 2012. N.T., 12/17/14, at 42. They were divorced by decree dated November 27, 2012. *Id.* at Exhibit 9.

[3] Father has a history of criminal arrests since 2002 related to illegal drugs. *See* N.T., 12/17/14, at 62.

motion to modify the existing custody order. *Id.* at 18; N.T., 2/10/15, at 7. A custody conference was scheduled for June 27, 2013, at which time Father's counsel appeared, but Father did not appear, without explanation. N.T., 12/17/14, at 18. As such, by order dated June 27, 2013, the orphans' court dismissed Father's contempt petition. *Id.* at Exhibit 10; N.T., 2/10/15, at 10.

On August 20, 2013, during a police raid of Paternal Grandmother's home, Father was arrested for manufacturing methamphetamine in the basement of the home, to which he pleaded guilty.[4] N.T., 12/17/14, at 5-6; N.T., 2/10/15, at 35, 38-39. Father was sentenced to a term of imprisonment of three and one-half to seven years.[5] N.T., 12/17/14, at 70. Father's minimum sentence date is July 20, 2016. *Id.*

On July 28, 2014, Appellants filed a petition for the involuntary termination of Father's parental rights. On the same date, Stepfather filed a petition for adoption. The termination hearing occurred on December 17,

---

[4] Paternal Grandmother and Father's brother were also arrested. N.T., 2/10/15, at 36. Paternal Grandmother pleaded guilty to conspiracy to manufacture methamphetamine, for which she was sentenced to a term of imprisonment not specified in the record. *Id.* at 31, 36-37. By the time of the subject proceedings, Paternal Grandmother had been released from prison.

[5] Father testified that, in 2013, prior to his arrest for manufacturing methamphetamine, he was arrested for a crime involving the possession of drug paraphernalia while visiting the home of a friend. N.T., 12/17/14, at 61-62.

2014, and February 10, 2015, during which the following witnesses testified: Mother; Father; Joseph Yannuzzi, Esquire (Attorney Yannuzzi), Father's counsel in the contempt action filed in June 2013; D.R. (Maternal Grandmother); and Paternal Grandmother.

On March 16, 2015, the orphans' court denied Appellants' involuntary termination petition. On April 14, 2015, Appellants filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On April 22, 2015, the orphans' court filed its Rule 1925(a) statement adopting the reasoning set forth in its March 16, 2015 opinion denying involuntary termination of Father's parental rights.

On appeal, Appellants present the following issues for our review.

> I. Whether the [orphans'] [c]ourt committed an error of law and abused its discretion in its [o]rder … entered on March 16, 2015 in denying [Appellants'] Involuntary Termination of Parental Rights Petition where it was clear from the testimony and evidence presented at trial that the biological father had demonstrated a settled purpose of relinquishing parental claims to the subject child and where the biological father failed to perform parental duties for more than six months which thereby should have resulted in the termination of the biological father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1)?

> II. Whether the [orphans'] [c]ourt committed an error of law and abused its discretion in its [o]rder… entered on March 16, 2015 in denying [Appellants'] Involuntary Termination of Parental Rights Petition where it was clear from the testimony and evidence presented at trial that the biological father's repeated and continued incapacity, abuse, neglect and refusal has caused the child to be without

- 4 -

essential parental care, control or subsistence necessary for the minor child's physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the biological father which thereby should have resulted in the termination of the biological father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2)?

Appellants' Brief at 4.

We review this appeal according to the following principles.

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

> *In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009) (*quoting In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

> *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and

- 5 -

> convincing evidence the existence of grounds for doing so.
>
> ***In re Adoption of A.C.H.***, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa. Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa. Super. 2004).
>
> ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa. Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008).

***In re Z.P.***, 994 A.2d 1108, 1115-1116 (Pa. Super. 2010).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the

- 6 -

needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007), *citing* 23 Pa.C.S.A. § 2511. Appellants sought the involuntary termination of Father's parental rights on the following grounds.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b)   Other   considerations.**—The   court   in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With  respect  to  any  petition  filed  pursuant  to subsection  (a)(1),  (6)  or  (8),  the  court  shall  not consider  any  efforts  by  the  parent  to  remedy  the

conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), and (b). Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the Section 2511(b) provisions. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 n.3 (Pa. Super. 2006).

Instantly, we conclude that the orphans' court abused its discretion in failing to grant Appellants' petition under Section 2511(a)(1). To satisfy the requirements of Section 2511(a)(1), we have explained, as follows.

> [T]he moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
> >
> > Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

- 8 -

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted).

This Court has held as follows, regarding the definition of "parental duties."

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with … her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted), *appeal denied*, 872 A.2d 1200 (Pa. 2005).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the orphans' court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1).

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*S.P.*, *supra* at 828. The *S.P.* Court further continued.

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*Id.* (citation omitted).

In concluding that Father's conduct did not warrant termination under Section 2511(a)(1), the orphans' court stated that, "[a]lthough Father has not [ ] performed any parental duties for [O.H.] in the last six (6) months,

the totality of the circumstances demonstrates that Father had been involved in [O.H.]'s life prior to his incarceration." Orphans' Court Opinion, 3/16/15, at 9. We are constrained to disagree, as the testimonial evidence demonstrates that Father clearly failed to perform his parental duties prior to his incarceration.

Mother testified that Father exercised partial physical custody under the May 2011 custody order for "maybe a month or two." N.T., 12/17/14, at 15. She testified on direct examination that Father did not subsequently make requests to see O.H. pursuant to the custody order. *Id.* Mother testified that, beginning in June 2011, she started working full-time, and Paternal Grandmother took care of O.H. approximately three or four days per week. *Id.* at 16, 30. Mother testified that, upon taking O.H. to and from Paternal Grandmother's home, she saw Father there "maybe a few times." *Id.* at 16. Mother testified on cross-examination as follows.

> Q. [A]re you aware was [Father] seeing the child while the child was in [Paternal Grandmother]'s care?
>
> A. Yes but, like I said, it wasn't a consistent relationship. He … would go a week or two without even seeing her….

*Id.* at 30. Paternal Grandmother testified that Father worked "a lot." N.T., 2/10/15, at 42.

Mother testified that Father lived in the basement at Paternal Grandmother's home, and she had concerns because O.H. "would tell me

- 11 -

she would go down in the basement and I told [Paternal Grandmother] numerous times she is not to go in that basement because it's … a storm cellar. It's not somewhere where the child should be." N.T., 12/17/14, at 17. Mother testified that, beginning in December 2012, O.H. developed head lice which did not clear up. *Id.* at 17. Mother found that Father's younger brother, then age 11 or 12, who lived with Paternal Grandmother, was infested with head lice. *Id.* at 17-18. In May 2013, Mother stopped taking O.H. to Paternal Grandmother's home. *Id.* at 24, 32. Mother testified that Father last saw O.H. in June or July 2013 for a one-half hour visit at the park, which Paternal Grandmother also attended.[6] *Id.* at 24. On August 20, 2013, Father was arrested for the manufacturing of methamphetamines in the basement of Paternal Grandmother's home. *Id.* at 5-6.

The testimony of both Mother and Paternal Grandmother demonstrates that, shortly after Mother's and Father's separation in 2011, up to the time of his incarceration in August of 2013, Father failed to affirmatively perform

---

[6] Maternal Grandmother testified with respect to an invitation she extended to Father and Paternal Grandmother to visit with O.H. at the park approximately one week before their arrest. Maternal Grandmother testified that Paternal Grandmother came to the park and said that Father "was showering and she was going to go back for him." N.T., 2/10/15, at 25. Paternal Grandmother did go back for Father, but she returned without him. Maternal Grandmother explained, "And I said, where was [Father]? And I guess his girlfriend had come to the house, so he did not want to come to the playground …." *Id.*

his parental duties. The evidence reveals that O.H. spent time in Paternal Grandmother's home while Father came and went, and Paternal Grandmother provided for the physical and emotional needs of O.H. while in her care.

In addition, although Father filed a petition for contempt against Mother after she stopped allowing O.H. in Paternal Grandmother's home, he failed to follow through by not appearing for the custody conference on June 27, 2013. Father testified that his lawyer, Attorney Yannuzzi, did not notify him by mail of the conference date. *Id.* at 69. However, Attorney Yannuzzi testified that his office telephones clients with respect to conference dates. N.T., 2/10/15, at 8-9. Further, Attorney Yannuzzi testified that he telephoned Father at the time of the conference when he failed to appear, but that he was unable to reach Father. *Id.* at 9-10. Attorney Yannuzzi also testified that Father never contacted him after that. *Id.* at 8, 10-11. Thus, we conclude the evidence demonstrates that, from May 2013, when Mother stopped taking O.H. to Paternal Grandmother's home, until August 20, 2013, when Father was incarcerated, Father failed to "exercise reasonable firmness" in maintaining his relationship with O.H. *See B.,N.M.*, *supra*.

With respect to Father's incarceration, the orphans' court concluded that Father has failed to perform his parental duties for the six months prior to the filing of the termination petition. The orphans' court's conclusion is based on the following factual findings. Father is currently incarcerated at

State Correctional Institute Mahanoy. Orphans' Court Opinion, 3/16/15, at 3, ¶ 16. The orphans' court found that "Father has not sent any gifts to [O.H.] during his period of incarceration, but he enrolled in the Prison Christmas Program." *Id.* at 4, ¶ 19. Further, the orphans' court found that Father "has contacted [O.H.] during his incarceration through Maternal Grandmother." *Id.* at ¶ 20. However, the orphans' court clarified that, "since Father has been incarcerated in State Prison he has not spoken to [O.H.]." *Id.* at 9. Significantly, in December 2013, Father was transferred from Northampton County prison to a state correctional institution. N.T., 2/10/15, at 23. Nevertheless, the orphans' court did not conclude that this conduct demonstrated a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

Father's testimony further revealed that Maternal Grandmother initiated telephone calls between him and O.H. for the first four months of his prison term, which he spent in Northampton County Prison.[7] N.T., 12/17/14, at 55. Specifically, Father testified that he spoke to O.H. every Sunday. *Id.* Father testified that he has not sent any gifts to O.H. while he has been in prison, but he applied for the Christmas program in prison

---

[7] Maternal Grandmother testified that Father "came to live with us when he was eighteen, and I've been more of a mother figure to him over the last thirteen years. So we have more of a history than just being the … ex-mother-in-law." N.T., 2/10/15, at 17.

"where they will send home gifts if you're selected, and I applied for the program and I haven't heard anything back yet." *Id.* at 56.

Maternal Grandmother testified regarding the telephone calls between Father in Northampton County prison, and O.H., then age three, while she was in Maternal Grandmother's home.

> Q. Would [Father] call every Sunday?
>
> A. He called a few – it wasn't every single Sunday. I don't know how many Sundays, but it wasn't every single Sunday.
>
> …
>
> A. I didn't have [O.H.] every single Sunday either.
>
> …
>
> Q. And how many times, roughly, do you think … [O.H.] actually spoke with him?
>
> A. Four or five.
>
> Q. [ ] Did there come a time when those phone calls stopped? The Sunday phone calls, did there come a time when those stopped?
>
> A. Yes, yes.
>
>    Because we just – it wasn't worth putting [O.H.] through that.   She did not want to talk on the phone.
>
> Q. Who chose to stop those phone calls?
>
> A. I – me and [Mother].
>
>    Because it just wasn't worth the aggravation of having [O.H.] get upset. She did not want to talk on the phone.

Q. So you and the child's mother decided to stop those phone calls?

A. Yes.

*Id.* at 19-21. Maternal Grandmother testified that she and Mother stopped allowing the telephone communication in October 2013. *Id.* at 21. No evidence suggests Father has attempted to communicate with O.H. after Maternal Grandmother ceased to initiate telephone communication.

Thus, the foregoing testimonial evidence supports the conclusion that Father has failed to perform any parental duties for the last six months prior to the filing of the termination petition on July 28, 2014. Indeed, Father has had no communication with O.H. since his transfer to a state correctional institution, which occurred in December 2013. The evidence demonstrates that Father has failed to "exercise reasonable firmness in resisting obstacles placed in the path of maintaining a parent-child relationship" both before and during his incarceration. *See B.,N.M.*, *supra*; *S.P.*, *supra*. As such, we conclude that the orphans' court abused its discretion in denying Appellants' termination petition pursuant to Section 2511(a)(1).

With respect to considering the effect on O.H. of terminating Father's parental rights pursuant to Section 2511(b), we note that the orphans' court made no findings as it had concluded termination was not proper pursuant to Section 2511(a). *See* Orphans' Court Opinion, 3/16/15, at 10, 13. Upon remand, the orphans' court will need to conduct an analysis pursuant to

Section 2511(b). *See L.M.*, *supra* (holding "[o]nly if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b)[]").

We note, however, that although the orphans' court made no specific findings, the record in this case disclosed the following. Mother testified that she never observed a bond between O.H. and Father. N.T., 12/17/14, at 24. On direct examination Mother testified as follows.

> Q. Does [O.H.] ever speak about her father?
>
> A. No. I mean, in the beginning she would ask where her mum-mum was and where –
>
> Q. Who's mum-mum?
>
> A. Her grandmother.
>
> Q. Okay.
>
> A. And she asked [about] her da-da in the basement at her mum-mum's, is how she referred to him as, but that was a little bit after they got arrested and, ever since then, I mean, she hasn't said anything to me.
>
> Q. Is [O.H.] well-adjusted now?
>
> A. Yes.

*Id.* at 25-26.

In contrast, Mother testified that O.H. and Stepfather "have a very strong bond", and that O.H. refers to him as "Dad." *Id.* at 22. Mother testified she and Stepfather began living together in July 2013. *Id.* They

married on September 7, 2013. Orphans' Court Opinion, 3/16/15, at ¶ 15(b).

In addition, the Guardian Ad Litem (GAL) informed the orphans' court on the record in open court that she observed O.H. with Stepfather and "from her body language … she … is openly affectionate with him, felt safe and comforted." N.T., 2/10/15, at 54-55. The GAL also told the orphans' court that O.H. "is extremely shy." *Id.* at 54. Finally, the GAL stated to the orphans' court that, "if the Court determines to terminate father's rights in this matter, I definitely believe that the best interest and welfare of the child would be served by allowing an adoption to proceed as contemplated." *Id.* at 55-56.

Based on the foregoing, we conclude that that orphans' court abused its discretion in denying Mother and Stepfather's petition, as they had met their burden under Section 2511(a)(1). Accordingly, the orphans' court's March 16, 2015 order is vacated, and the case is remanded with instructions for the orphans' court to determine whether termination is proper pursuant to Section 2511(b), and enter an appropriate order.

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/6/2015